The undersigned have reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Morgan S. Chapman and the briefs and oral arguments before the Full Commission. The appealing party has not shown good ground to reconsider the evidence, receive further evidence, rehear the parties or their representatives, or amend the Opinion and Award.
*******************
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing as:
STIPULATIONS
(a) The date of the alleged injury for the shoulders which is the subject of this claim is August 13, 1993. The date of alleged injury for the carpal tunnel syndrome is March 2, 1994.
(b) On such date the parties were subject to and bound by the provisions of the North Carolina Workers' Compensation Act;
(c) On such date the Employer-Employee relationship existed between the Employee-Plaintiff and the Employer-Defendant;
(d) On such date the Employer-Defendant employed three or more employees;
(e) The Employee-Plaintiff has not received weekly compensation for the date of injury to present;
(f) Employer is self-insured, with ITT Hartford as the servicing agent.
(g) The Employee-Plaintiff's average weekly wage is $263.22, yielding a compensation rate of $175.48.
In addition, the parties stipulated into evidence one hundred and eight pages of medical records and reports.
*******************
The Full Commission adopts the findings of fact found by the Deputy Commissioner as follows:
FINDINGS OF FACT
1. Plaintiff began working for defendant in December 1991 in the print shop of the medical school. The print shop received orders for various tasks ranging from providing paper for the copy machines to printing and binding books. Consequently, plaintiff had a variety of duties, including cutting paper to specified sizes, collating materials, helping to assemble and bind books, receiving and shelving supplies and helping with shipping activities. A machine actually cut the paper, but he would have to "jog" and bend the paper to get air into it, place it on the machine and then operate the controls so that the paper was cut to the size ordered. He also operated duplicating machines and performed maintenance and cleaning tasks in the area.
2. The paper plaintiff worked with was referred to as "parent" paper. It came in large sheets of several sizes, including 23 x 35 inches, 25 x 38 inches and 26 x 40 inches. The paper was provided in cartons which could weigh up to 150 to 200 pounds. Because of the size and weight of these boxes, they were stored on the lowest shelves in the storage area so that they could be pushed off the pallet without having to be lifted. After some of the paper had been taken out of the boxes, the rest of the paper might be placed on a higher shelf so that full boxes could be placed on the lower shelves where the partially empty ones had been located.
3. During the summer of 1993, plaintiff began gradually to develop shoulder pain which was worse on his left side. On August 23, 1993 he went to Dr. Curl, an orthopedic surgeon, with complaints of shoulder pain and with a history of being a weight lifter. X-rays revealed that the anatomy of his shoulders predisposed him to rotator cuff problems, so Dr. Curl ordered an MRI which revealed a rotator cuff tear in his left shoulder. Consequently, surgery to repair the tear was scheduled for September 28, 1993.
4. On September 20, 1993 plaintiff completed an occurrence report for his employer in which he attributed his shoulder problem to heavy lifting and moving of heavy, awkward boxes over a period of time. Defendant subsequently denied liability for workers' compensation benefits.
5. Plaintiff underwent surgery on September 28 and Dr. Curl found shredding of the tendon which was consistent with chronic wear and tear. Following the operation, plaintiff initially seemed to progress satisfactorily, but he later did not regain the motion Dr. Curl expected. Dr. Curl ordered physical therapy. By February 28, 1994 plaintiff was complaining of some intermittent numbness in his left hand and popping in his neck, so additional diagnostic tests were performed. Nerve studies revealed evidence of carpal tunnel syndrome in his left wrist and cubital tunnel syndrome in his left elbow. Consequently, Dr. Curl referred him to Dr. Poehling in the Hand Center for evaluation. Dr. Poehling examined him on March 28, 1994 and recommended surgery for the carpal tunnel syndrome. Accordingly, plaintiff underwent a carpal tunnel release on April 12, 1994.
6. Although plaintiff experienced some improvement of his left hand symptoms after the surgery, he continued to have some numbness. His right hand also developed some carpal tunnel symptoms. Further nerve tests indicated that he had similar problems in his right wrist and elbow as he had on his left side. However, in view of the multiple neuropathies, no further surgery was recommended and he was treated conservatively. Dr. Ruch also examined him and concurred with the recommendation against surgery.
7. Dr. Curl continued to follow plaintiff for his shoulder problems and in May 1994 ordered physical therapy for both shoulders since plaintiff still had not regained the motion in his left shoulder and his right shoulder symptoms had worsened. He improved but then in July had an incident in which his left shoulder popped. Afterwards, he lost some of the motion he had regained. Dr. Curl ordered an arthrogram which revealed a new tear in the left rotator cuff. However, at that time he did not recommend another operation but instead continued to treat plaintiff conservatively with physical therapy and exercise.
8. In March 1995 plaintiff reported worse problems with both shoulders. Dr. Curl subsequently ordered an MRI which indicated that there was a tear of the right rotator cuff. Consequently, plaintiff underwent surgery to his right shoulder on July 6, 1995. However, no rotator cuff tear was found during the operation. Thereafter, Dr. Curl followed his progress regarding his bilateral shoulder problems through February 12, 1996.
9. Plaintiff has alleged that his bilateral shoulder problems arose either from an incident occurring on August 13, 1993 or from repetitive lifting in his employment. He testified that he first felt shoulder pain on August 13, 1993 when he and his supervisor, Tom Connor, lifted a full carton of parent paper to the top shelf in the storage area. However, he did not report such an injury to Dr. Curl on August 23 or to his employer on September 20. Furthermore, Mr. Connor had never lifted a full carton of paper to the top shelf and was never advised by plaintiff of any injury. Consequently, plaintiff's version of the incident is not accepted as credible. There was nothing proven to have been unusual or out of the ordinary in the manner that plaintiff performed his regular work routine that day. In addition, his symptoms had already been developing for a period of months.
10. Plaintiff described his job to Dr. Curl as involving constant lifting of paper to shelves which were often over his head, and based upon that information Dr. Curl indicated that his condition was work related since overhead lifting and repetitive heavy lifting at higher than waist level would increase the risk of developing rotator cuff problems. However, plaintiff in fact did not lift heavy items to the top shelf and only lifted light items overhead a couple of times per day at the most. His job did require lifting of paper at lower levels, but not nearly to the extent that he described to Dr. Curl. Therefore, Dr. Curl's opinion was not based on the actual circumstances.
11. Plaintiff was a weight lifter, an activity known to precipitate shoulder problems. The bones in his shoulders also were of a certain shape that predisposed him to rotator cuff problems. He did not do frequent overhead lifting with his job, nor did he repetitively lift heavy weights over waist height. Plaintiff failed to prove that he was placed at an increased risk of developing rotator cuff problems by reason of his work duties as compared to the general public not so employed.
12. Plaintiff's bilateral rotator cuff problems were not proven to have been an occupational disease which was due to causes and conditions characteristic of and peculiar to his employment with defendant and which excluded all ordinary diseases of life to which the general public was equally exposed.
13. Plaintiff also was not shown to have been placed at an increased risk of developing carpal tunnel syndrome as a result of his work activities, and his bilateral carpal tunnel syndrome was not a proximate result of his work duties with defendant. Plaintiff's carpal tunnel syndrome also was not an occupational disease which was due to causes and conditions characteristic of and peculiar to his employment and which excluded all ordinary diseases of life to which the general public was equally exposed.
*******************
Based upon the findings of fact, the Full Commission concludes as follows:
CONCLUSIONS OF LAW
1. On August 13, 1995 plaintiff did not sustain an injury by accident arising out of and in the course of his employment with defendant-employer. G.S. § 97-2(6); Anderson v. Motor Co.,233 N.C. 372, 64 S.E.2d 265 (1951).
2. Plaintiff has not proven that he developed an occupational disease which was due to causes and conditions characteristic of and peculiar to his employment and which was not an ordinary disease of life to which the general public was equally exposed. G.S. § 97-53(13); Booker v. Medical Center,297 N.C. 458, 256 S.E.2d 189 (1979).
3. Plaintiff is not entitled to benefits under the Workers' Compensation Act for his bilateral rotator cuff problems. G.S. § 97-2 et seq.
4. Plaintiff is not entitled to benefits under the Workers' Compensation Act for his bilateral carpal tunnel syndrome. G.S. § 97-2 et seq.
*******************
Based on the foregoing findings of fact and conclusions of law, the Full Commission affirms the holding of the Deputy Commissioner and enters the following:
ORDER
1. Under the law, plaintiff's claims for benefits are hereby DENIED.
2. Each side shall pay its own costs.
 S/ ______________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
CONCURRING:
S/ ______________________ J. HOWARD BUNN, JR. CHAIRMAN
S/ ______________________ BERNADINE S. BALLANCE COMMISSIONER